This is 4090863, the People v. John E. Bell. We have for the appellant, Linda Sue McClain, and for the appellee, Thomas Fripp. Ms. McClain. Thank you. Please support, counsel. My name is Linda McClain, and I represent the state of Illinois in this appeal from the trial court's granting of defendant's motion to suppress this letter. The issue in this case is whether defendant's living girlfriend had actual or apparent authority to consent to the seizure of the computer allegedly containing child pornography. Is there anything in the record that shows that the defendant was ever asked about having the computer searched? No, he was not asked. Wait, wait. Does that mean there is something in the record, he was asked and he said no, or there's nothing in the record? He was sitting in the squad car when she was asked for permission, so he was never asked. They weren't in the squad car together, were they? No, there was two squad cars. So we can infer from that that the police chose to ask her. He was not present when they decided to ask for consent to certain... Not present, meaning he'd already been transported? He was in the squad car. So he was present at the scene, he wasn't present at the conversation where she was asked. Is that what you mean? Under Matlock, the U.S. Supreme Court case, defendant was in the squad car on the premises when his girlfriend was asked for consent. So it's very similar to that circumstance. The state is maintaining that defendant's living girlfriend had both actual and apparent authority. In ruling on actual authority, the trial court erroneously focused on the property interests of the living girlfriend, noting that defendant owned a home, the girlfriend paid no rent, and the girlfriend had only lived there 10 to 11 months. Did the court really say only? I'm not positive. Pardon? I'm not positive they said only. I think they said girlfriend lived there 10 to 11 months and defendant had lived there 10 years. Okay. The focus is supposed to be on the mutual use and extent of that use. Common authority is recognized in cohabitant relationships. In this case, the 58-year-old defendant and Penny have lived together for 10 or 11 months, a significant period of time. They talked of marriage, they shared the only bed in the house, Penny sleeping with defendant the night before the confrontation. She used his residence as her own and all of her worldly possessions were there. She had just been kicked out, right? She had not. She still lived there. She had not left the home. Well, he boxed up all of her belongings and stuck them out in the front, right? He, all he did was bring boxes up from the basement. She still had all of her clothes, her personal items, and even a dining room table and chair was still in the basement. What was in the boxes? I'm not sure. I know specifically her deceased mother's china was in one of the boxes. But I don't know what the other boxes contained. So the answer is yes, he was in the process of throwing her out. The testimony was what the officers knew. Deputy Harris testified the defendant had told him in regards to what he was hoping the living arrangements were going to be, that he wanted her to move out. Deputy Harris testified that Penny had told him that Tiffany had told her to get out and tried to throw her out of the house. And Deputy Cody testified that the defendant had stated he was asking Penny to leave. So in all of these cases, wanting to move her out, trying to throw her out, asking her to leave, she had not moved yet. She had no place set up to move to. While Penny did not have a key, she still had unlimited access to her defendant using the garage door opener. In fact, they came and went through the garage. Penny also had a hand in the day-to-day operation of the residence, dealing with the salt pump people on the day of their dispute. While the defendant owned the computer, they both used it, Penny perhaps more than the defendant. When she moved in, she left her own computer in storage because they did not see a reason to have two computers. Their passwords were on post-it notes stuck to the monitor so they both had access to each other's files. The state is maintaining that Penny had the right to permit the inspection in her own right by inviting Penny to live with him in a conjugal relationship and letting her use his computer as if it were her own. The defendant assumed the risk that she would permit the search of his home and seizure of the computer. While they had a domestic dispute and the defendant told her he wanted her out, the prevailing view is that the existence of antagonism is not itself a ground for finding consent to be ineffective. Except where the antagonism has reached a point where it has resulted in a change of the living arrangements, it does not bear upon a co-occupant's authority to consent. While both were living in the premises, the equal authority does not lapse and revive with a lapse and revival of amical relations between conjugal partners. At the time Penny gave consent, the living arrangements had not changed. She had not moved out or made arrangements to live elsewhere. All of her belongings were still there. She came back for her personal items after her release from jail. She left only because she had been arrested with the defendant for domestic battery. Ryerson is a Seventh Circuit case. In that case, although the defendant claimed he revoked his ex-wife's actual authority after she moved out, she continued to store her personal things there at the time of the search, so the defendant assumed the risk she would return. The State maintains that the defendant's expectation of privacy was, if anything, diminished as a consequence of the antagonism. This is particularly true where the defendant committed a crime on Penny. In this case, Penny called 9-1-1 after the defendant shoved her around and tried to tie her up. Or when the defendant's criminal activities, such as sexual assault, might want to avoid being implicated. In this case, Penny had joint access to a computer possibly containing child pornography. How much money did she pay toward the mortgage? I think it was like $7,200 or something like that. I'm not positive. And it wasn't refunded until after this consent? Right. It was refunded. She had put it in a savings account. It was refunded. The defendant refunded it? Yes. When? I think he... After he was arrested? I believe so. What's the standard of review? The standard of review is that findings of historical fact are upheld on review unless they are against the manifest way of the evidence. But on the ultimate question, this Court takes a de novo review. So it's de novos what all this means? Yes. I believe it's de novo review. Penny also had apparent authority to give consent or maintain. Again, looking at the trial court's order, the trial court erroneously focused on the officer's knowledge of ownership and possession of the residence and its contents, and not on the officer's knowledge of mutual use. The officer knew Penny and had lived with the defendant for a length of time, and it was obvious it was a conjugal relationship. The officers knew that they had been in a domestic dispute, but as already discussed, except where antagonism results in a change of living arrangements, it does not bear upon consent. The officers knew that she had not yet moved out. The officer testified the boxes near the stair could have been going up, down, or staying there. Deputy Cody, however, testified the defendant said the boxes had been taken out of the basement. As for the computer, Deputy Cody testified that no one said who actually owned the computer, but Penny said both she and the defendant were allowed to use it. In Penny, the officers knew that Penny had detailed information about the premises, including the location of the computer and what was on it. In this case, Penny's property interest was irrelevant. Penny had not yet moved out and still lived there. That's what's relevant. The officers were entitled to assume that the defendant gave Penny authority over the premises and assumed the risk that she would consent to a warrantless search. The officers had a reasonable basis to conclude Penny could consent to this search. The state is maintaining that the circumstances were not ambiguous. The deputies knew everything the parties could tell them, and further inquiry would have just placed a burden on the police to decipher whether Penny and the defendant's emotions were accurate or not. The state is also maintaining that the officers had probable cause to seize the computer based on Penny's statement that it contained child pornography. Is that argued at the trial level? I don't believe it was argued at the trial level. However, waiver is a limitation on the parties, not the court. And we're asking for de novo review. So you're asking us to reverse the trial judge at that point based on an argument the court never heard? The evidence was before the court. No, that's not my question. Yes, I am. That's not the usual position by the state, is it? No, it's not. I'm not usually on this side of the aisle. If you compare this to the motel room case, even though it involves a suitcase, it's pretty clear that the parties are living in the motel room. Here, could you argue that it was the arrival of the police themselves that prevented the defendant from further acting on his desire to limit her access to the place? I mean, they arrive in the middle of everything. We know that, or he asserts that he's kicking you out, or if you want to leave, that's okay, whatever. And he gets her stuff, which is perhaps a prelude to putting it out on the porch. What if the police had arrived and found her sitting on the front porch and the front door was locked? And he answered the door and said, my house, I kicked her out. If you want to arrest me for the domestic violence, go right ahead. But she doesn't live here. And she says, well, I have lived here. What should the police do? I think that's more definitive of a kicking out. I mean, we've got a 58-year-old man living 10 to 11 months with a woman. I think that they have a domestic dispute. Police answer domestic disputes all the time. It could be for real, it could be not for real. What if it's not conjugal and let's say they're of the same sex and they don't have an intimate relationship? Is it different? And if it's not different, then what do we care if they share the same bed? I mean, you let your friend move in for 11 months. Is that a different case because it doesn't involve a conjugal relationship? No, I think cohabitation can be conjugal, family, friends. You said that the example I gave was somewhat more definitive. Right. That language suggests a gradient on which the evidence moves. So if I'm a police officer and I show up and I find a woman chasing a man and he's naked and she's chasing him with a hatchet and they tackle each other and I get ready to arrest them and then she tells me all the stuff that's in his trailer. And the police say, ah, we've got... and she says, I give you consent to go in there and look because I've been staying there with him. Should the police wait and get a warrant or should they think maybe those circumstances suggest that this person maybe not ought to be the one to ask for consent to search? That just is a case I remember that I had. Yeah. And the police instantly seized on the consent from the person who seemed in those circumstances to be the least likely to have authority or a superior right to the premises. All of which I'm getting at was Justice Meyerskoff's first question about what he asked. Is it good police work to take the point of least resistance or should the police respond to any ambiguity by asking the defendant first? I think that the Supreme Court in Matlock has said that the police doesn't have to respond to ambiguity, every ambiguity as a case-by-case situation. And I think that in this case, like Matlock, defendants in the squad car, they could have asked the defendant in the squad car in Matlock and they did not and that was okay. This case, he wasn't removed from the house so that they could get rid of him and ask the woman. You know, he's removed because of the domestic battery. They're both removed at that point. They're arresting both of them, aren't they? Yes, they arrested them both. Well, the state would ask this court to reverse the trial court's order on the motion to suppress. Thank you. Are there any other questions? Thank you, Ms. McClain. Mr. Griffiths? Thank you, Court Counsel. The first point I would like to make is that I tried this case myself and I believe this to be a very fact-driven and fact-specific case, which was heard and decided by a very experienced trial judge, being Tim Stedman in this particular circumstance. Now, as such, the Ornelas case, which we cited in our brief, is very clear, that the court's factual findings should be reviewed only for clear air. They should be given great deference and should only be reversed if they're against the manifest way to the evidence. Now, with respect to the principle of common authority, I agree the Matlock court defined that principle, and it rests on the mutual use by persons having joint access or control, and it goes on to state that the third party's right must equal or exceed the defendant's right of occupation. Now, in this particular case, Judge Stedman found the defendant had resided at the residence for a period of 10 years. He was the sole owner. Penny Maddox had lived there for 10 or 11 months. She paid no rent, and she resided there only with the consent and permission of the defendant. And he concluded that, therefore, she did not have equal rights to the use or occupancy of the residence. This event in question occurred on the October 21st in the afternoon? It was actually the evening. I believe the police were called about 8.30ish, and they arrived shortly after 9. Okay. Now, that was the day that this – actually, the argument had occurred the day before. The first argument, did it not? The first – this part I have straight in my head. The police were called on a Monday. On that Monday, the argument had started when they went to Crackles to get a hamburger, and she smashed a hamburger up against the side of my client's head. I believe that was about 4 o'clock, and it had continued from that point to the point that they were actually called. The argument actually started on the Thursday night, Friday morning, before this Monday, where she claimed she found objectionable items on the computer. Okay. Now, let's go – I'm trying to figure out the timeline to understand exactly what your position is and what the trial judge said here. That Thursday night, had the cops shown up at the residence in question, did Ms. Maddox present the authority or possess the authority at that time to consent to this search? Common authority, I think not, Your Honor. Apparent authority? Well, then let me ask you this. Was it at any point during the 10 months at which she lived there that she possessed common authority? I don't believe so, no, Your Honor. What did she possess? Well, I have a number of factual findings here. Okay, go ahead. Tell me what they are. Which, again, I think is very much supported by the evidence, and which also dovetail with Judge Steadman's findings. But the evidence showed that the defendant owned the home at 6376 Kitchen Road for 10 years. What case says that matters? I think the Matlock case says that, Your Honor. Let me go on. Go ahead. That his name was the only name on the title to the home, and he was the only person with any possessory or ownership interest in the home. The home was free and clear of all loans and mortgages. That Penny had moved into his house in early December of 2007, and this incident occurred, again, October 20 of 2008. She was not a tenant. There was no lease, either written or oral. She did not pay rent. She stayed at his home exclusively. These are all property law issues. What do they have to do with whether or not she lives there for purposes of the Fourth Amendment? Well, they're property law issues, but they're also facts in this particular case, Your Honor. Right. Again, the way I read Matlock is that common authority, the third party's right, must equal or exceed the defendant's. So for 10 months she was living there with no rights of any kind as resident? Her rights were based solely on his permission and consent. She didn't have a key to the residence. What case supports your position? I think all of them. I think Matlock supports our position, Your Honor. What about the motel case that you heard Justice Connacht speak of? The way I understand the motel case, they had each recently moved into the motel room. The police arrived, and they asked her for consent, and her ownership interest had never been terminated. And I think both of their ownership interests in a motel room in a situation like that is kind of thin, Your Honor. Going on with the facts, she's only able to gain access to his home with the use of a garage door opener, which is located in one of his vehicles. This fact is not in dispute, Your Honor. Once she's released from jail, she's only able to retrieve her belongings by going through an open kitchen window because she has no key. She doesn't have the garage door opener. And once she leaves, she never, ever, ever returns to that residence. In terms of her belongings, she's got one small shelf upstairs that contains a couple of towels. She's got her personal belongings. She has her clothing, but everything else she owns in the world. So for 10 months, she had no possessory interest living in that house? I'm not saying she had absolutely no possessory interest, but I believe under Matlock, did her rights equal or exceed the defendant's? I think the answer to that question is absolutely no. She did have access to the computer, Your Honor. As the court might recall, there were post-it notes on the screen that listed each of their e-mail addresses and so on. But this was revoked after the incident on October 18 where Mr. Bell removed the keyboard from the computer, put the keyboard under the bed, and told Penny Maddox that she no longer had permission to use that computer. And that's also supported by the police testimony where Officer Cody found the keyboard under the bed, and Officer Harris admitted that Penny Maddox told him that she no longer had permission to use the computer. Let me ask you a question. It seems like you're almost going down the road that unless a paramour has a signed agreement, they essentially have no common authority over the property. So during that 10 months, if she invites someone over, can he walk in the door and immediately call the police and say someone is trespassing? Or if she gets a sandwich or she gets something out of the refrigerator after coming through the window because she couldn't find the garage door opener, is that a burglary, residential burglary? She's got authority to be there. He's granted her authority to be there. He's granted her authority to use the water, the toilet, the heat, the air conditioning. He gives her access to his vehicle. The garage door opener is better than a key. There are a lot of people that come in through the garage because they like that. They don't have to carry a house key. They've got a hidden key that they both know where it is in case they forget their keys and the garage door opener doesn't work apparently. What authority does she have? And if she's got authority to get food out of the refrigerator, which belongs to him alone, maybe he's the only one, let's say he's the only one working or he put the food in the refrigerator, can she give a sandwich to a friend? Or is that theft? I think she had the authority to reside there based on his permission and consent. But if he says during any one of those 10 or 11 months, Benny, I don't like you anymore. You need to get out. She doesn't have any authority at that point to stay. She's got to get out. It's his house. I asked you about this the night before the trouble arose, whether she had authority then. You said no. She has authority to do certain things, I don't believe, based on Matlock. Matlock's very clear. Let me ask it this way, counsel. She had apparently a bunch of stuff there, clothing, boxes of stuff that he packed stuff. In the basement. We're now hearing about furniture and whatnot as well. One shelf. Pardon? One small shelf. I thought one of Ms. McClain's spoke about some dining room table. Is that hers? In the basement, Your Honor. Okay. Tell me what you think additionally, factually, would be necessary to show that she had equal authority during those first ten months? Your Honor, based on the way you asked the question, I think she would have to have resided there, say, for a very lengthy period of time, say three to four years, or she would have had to have her name on a lease or have paid him rent or had some access or connection to that residence versus simply living there based on Mr. Bell's permission and consent. What was the $7,200? She gave him $7,200, which he was to apply at some point, it was kind of vague, towards the mortgage. He took the money, it was put into a bank account, and after they broke up, it was returned to her. One nickel was never applied towards the marriage. One nickel was never put towards that home. What would be those additional facts you spoke of that would establish this right to use? I'm not understanding that question, Your Honor. You mentioned she'd have to live there three or four years, or there'd have to be additional facts, like signing a lease. What would be the additional facts? Signing a lease, paying rent, being paid. Say that it was Mr. Bell's house, and they got married, and she was his wife. I think that would change things. Say that it was a sibling of Mr. Bell's. I think that would change things. Or a child of Mr. Bell's. I think that would change things. It's a girlfriend living at his house. She lives there totally at his whim, Your Honor. For 10 months? For 10 months. Okay, so does that mean she has access to the refrigerator? Yes, she does. Now, to follow that up, okay, not only do I think she did not have equal rights before the police arrived, but when the police arrived, there's no question Mr. Bell had terminated her authority to live there. He'd told her to leave. He'd packed her boxes up. They're stacked near the front doorway. He has called her son, or he's offered to call her son so her son could come pick her up and or drive her over to her son's residence, and it was over. But the police arrived in the middle of the domestic dispute before she actually is moved out of the house, and that changes things somewhat in this circumstance. It's not quite as black and white, but it would have been black and white about an hour later. So she had no right to occupy and use the residence? No, Your Honor. Is there any case that stands for that proposition? No. On any facts at all? Would you be the first to say if you're cohabiting for 10 months that you got nothing? The closest case I saw fact-wise was the Ryerson case, which is a Seventh Circuit federal case. But in that case, the way I read it, again, we have a wife versus a girlfriend, and I think that makes a big difference. And there had been a tiff. She had left on her own accord, Your Honor, and then after she cooled off, she had come back, and at that point she gave the police officer's consent. So I think fact-wise that case is much different. So being married makes all the difference? Well, having been married for a long time and not married for a long time, I think it does make a difference, Your Honor. Yes. The case also cites three cases based on... What about the apparent authority? Are the police officers supposed to be conversant with all this detailed information and decide who's got a lease and whether or not... For instance, what if he had spent any of the $7,200 he had given? Would that change? I don't think... I don't think that they could be expected to answer or ask that question, Your Honor. And the standard there is that with the facts available to the officers at the moment, that's a tough question, warrant a man a reasonable caution that Miss Maddox had authority. And if it's ambiguous, then they have to make further inquiry. Now, again, Judge Stedman found that the officers knew at that time that there had been a complaint regarding domestic violence, that Penny Maddox resided there for 10 months, that he told them he wanted her out because of her alcohol problem, that Penny Maddox told them that the defendant wanted her out, had told her to get the F out and tried to physically throw her out of the house, and that both officers testified that they were aware all of her boxes were stacked by the doorway. So, again, at best, this is an ambiguous circumstance and they should have made further inquiry. Now, again, should we expect two police officers at 9.30 on a Monday night to ask every perfect question? No. Okay? But on the other hand, we've got to do a little bit better than put him in one car, and he wasn't still at the house. He was either down the driveway, at the end of the driveway, or halfway down the street, at which point the officer who's driving that car talks to his commanding officer, and then he relays to the younger officers at the scene, asks Miss Maddox for authority to take the computer, when the guy is sitting right there in his car. That was the process that went on on that particular night. Why is that improper? Well, I just... I just don't think it's very good judgment, Your Honor. If she's got apparent authority, is that apparent authority trumped because he also happens to be present? Well, I guess I would answer it this way. I think, based on the facts I just recited to the court, it was apparent she did not have apparent authority. She was being kicked out of the house, and they knew it. Let me try again. Because I preceded it by saying, if she has apparent authority. Maybe I wasn't clear enough. Assuming she has apparent authority, is it trumped by the fact that he is also present? If she has apparent authority, I'm not sure it is trumped by the fact that he's also present. But I also think, if they know that he's the owner of that house, she's a girlfriend, and she's residing there, it's better police conduct and better police practice to not not ask the guy who's clearly the owner of the house, but to ask his girlfriend, who they both fully admit has been drinking. Officer Cody says it was clear that she's intoxicated, and Officer Harris says, well, I'm not sure she was intoxicated, but I could tell she'd certainly been drinking. And that's the judgment they made. Not to get up on my soapbox and beat the drum too hard, but I think some of the police testimony and conduct in this particular case wasn't very good. The younger officer says she's drunk. The older officer says, well, she's been drinking, but she's not. The younger officer says the boxes were near the doorway. The older officer says the boxes were near the stairwell. They separate the two. They only ask for her consent when he's in another car on the way to the jail. He doesn't even learn the computer's gone until two days later, and they say, well, you know, he had access to a phone. He could have called about the computer, had somebody take the computer out of the house. He doesn't even know the computer's been removed from the house. Why did those last factoids matter? The last factoids matter because... About the computer being gone when it was told two days later. How does that address any of our issues? I'm sorry, Your Honor, I'm not understanding this question. You told us that he didn't even learn his computer was taken until two days later, et cetera. How does any of that address the issues before us? Because they don't ask him for his permission, Your Honor. They only ask her. And I think that fact... If they told him that night, we have your computer, would you not be here? I don't think that fact probably changes anything, Your Honor, to be fair to the court. But again, based on all the facts before the court and the principles of law, I do not believe she had apparent authority. I believe at best, as Judge Steadman said, it was an ambiguous circumstance. They absolutely asked no further questions other than asking her for her consent. As a matter of law, why are we essentially called upon to protect this defendant from himself? That is, no one held a gun to his head and said, Okay, Penny, you can live with me for ten months and for all practical purposes and live with me as if this is your home, in and out as you wish, buy things as you wish, move in as you wish with stuff. And then suddenly he says, Oh no, you don't have authority to do this stuff anymore. And why, until such time as that has been achieved, that she is no longer a resident, why are we called upon to protect him from taking her out in the first place? I think, first off, because these are the laws... I mean, I didn't make these laws up. These are the laws we have to deal with here, Your Honor. And again, common authority, if she had it, had clearly been terminated. And apparent authority, the facts available to them at that time was she had been kicked out. But versus asking further questions of him, they only ask her while he's on his way to the police station. Did you provide any authority to this Court dealing with the question of assuming common authority exists, when and how it's terminated, over what period of time and what acts? Because it seems to me that if we disagree with you, and I can't speak for my colleagues, but I certainly do, that she had no common authority for the first ten months of this. And the issue in this case is, at what point and under what circumstances did that common authority seep away from Ms. Maddox and had it seeped away under the circumstances of this case? But that wasn't addressed. I think her authority seeped away on that night, Your Honor, when you kicked her out. But she's still there, her stuff is still there. Does her stuff have to be gone? What if she was just sitting there and said, well, he blows hard and I'm just going to wait until tomorrow, maybe this has happened before. Who knows? I mean, she might, you know, at what point are we, when you take someone in to cohabit, at what point are we capable of saying it's over? I think it would have been over if the police arrived in the middle of the situation, Your Honor. I think that is borne out by the fact that, A, she had no ability to get back in the house two days later except come in the window, and B, she never played foot in that house again. If she went back the next day, your argument wouldn't be the same? I think it could lend a different flavor to this particular case. But again, I think her common authority had been terminated, and she did not have apparent authority at the time the police were asking questions. It was very obvious to the officers, Your Honor. So again, I believe, Your Honor, that Judge Stedman's decision was very specific in its factual findings. I believe that in terms of those findings, the application of the law, that there's certainly a nexus, and his decision is well-founded. It conforms with the law, and I would ask that Judge Stedman's decision be confirmed. A couple other points. In terms of the PC argument of the State, I don't quite understand that argument. Even if there was problem cause, it certainly had to have obtained a warrant, which they did not do. It was not raised at the trial court level, and it was waived by the State. In terms of the inevitable discovery argument, Your Honor, in this circumstance, I think the problem is that there was no independent investigation, even if there had been. Again, it was not raised at the trial court level, and it's therefore been waived by the State. Thank you for your time. Thank you, Counsel. Roberta? I just wanted to reiterate that property interest does not matter, and I think that the trial court and my opponent have put a little too much emphasis on that. In the Matlock case... Well, what does matter? Mutual use. Mutual use by the cohabitants. Well, I asked Mr. Griffin about the business of when and how does this mutual authority seep away. I don't think he addressed it. Did you? I cited several cases in my brief, and a common theme, a lawless case out of the Fourth Circuit, at the time of the search, her personal possessions were still there. I can't pronounce it, T-R-Z-A-S-K-Y, Second Circuit case. She had only recently moved out, still possessed a key, but had to get it from her sister, had some personal belongings in the apartment that was considered mutual use. Brother's case... How about Illinois v. Rodriguez, which is the United States Supreme Court case? She moved out, but she kept possessions there. She spent the night with him. She did use it. They continued to have that intimate relationship, and the Supreme Court said, no, that's not enough. They found no actual authority, but they remanded for a finding on apparent authority. That's how I read it. So there was a possibility it could have been apparent authority. They were going to remand. So I think maybe there are several things that could indicate that things are not over, and one of them is whether the personal belongings are still there, and they are all still there in this case. So we'd ask the court if there are no other questions to reverse the trial. Thank you, counsel. We'll take this matter under advisement and adjourn today.